**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____

| | | |
|---|---|---|
| **SAEED JACKSON,** | ) | |
| **Plaintiff** | ) | |
| **V.** | ) | **TRIAL BY JURY DEMANDED** |
| | ) | |
| **BERTERA SUBARU OF HARTFORD, INC.,** | ) | |
| **JASON NAPOLETANO, JESSICA WILLIAMS** | ) | |
| **and SANTANDER CONSUMER USA, INC.** | ) | **COMPLAINT** |
| **Defendants** | ) | |
| | ) | |
| _____) | | **AUGUST 17, 2012** |

<u>**COMPLAINT**</u>

1.      This is a suit brought by a Connecticut consumer arising from two separate purchases of the same motor vehicle from Bertera Subaru of Hartford, Inc. ("Bertera").  Plaintiff brings this action to recover actual, statutory, and punitive damages, reasonable attorney's fees, and costs from the defendant Bertera for engaging in illegal, unfair and deceptive actions.  Plaintiff claims that Bertera committed multiple violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq. ("ECOA"), the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* ("CROA"), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"), the Connecticut Retail Installment Sales Finance Act, Conn. Gen. Stat. §§ 36a-770 *et seq.* ("RISFA), Articles 2 and 9 of the Uniform Commercial Code, Conn. Gen. Stat. § 42a-1-101 *et seq.* ("UCC"), and Connecticut's prohibitions against civil theft, Conn. Gen. Stat. § 52-564, and civil forgery, Conn. Gen. Stat. § 52-565.  Plaintiff also claims against Bertera for the common law torts of fraud, negligent misrepresentation, fraudulent misrepresentation, negligent

infliction of emotional distress, misappropriation, and for breach of contract.  Plaintiff also claims against Jason Napoletano ("Napoletano"), who is a finance manager at Bertera, under the CROA, CUTPA, and for the common law torts of fraud, negligent misrepresentation, fraudulent misrepresentation, and negligent infliction of emotional distress. Additionally, Plaintiff asserts claims against Jessica Williams ("Williams"), an employee of Bertera, for civil forgery.  Plaintiff also claims against defendant Santander Consumer USA, Inc. ("Santander") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, the ECOA, and CUTPA.

2.     Plaintiff is a consumer and natural person residing in Glastonbury, Connecticut.

3.     Defendant Bertera is a Connecticut corporation with its headquarters in Massachusetts that operates an automobile dealership in Hartford, Connecticut.

4.     Defendant Napoletano is a Connecticut resident who was employed by Bertera during the time of the transactions alleged herein.

5.     Defendant Williams is a Connecticut resident who was employed by Bertera during the time of the transactions alleged herein.

6.     Defendant Santander is an Illinois corporation with its headquarters in Texas.  It is engaged in the business of indirect automotive lending and accepts the assignment of retail installment sales contracts from automobile dealerships, including Bertera.  It is registered as a sales finance company with the Connecticut Department of Banking.

7.     Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

2

8.      This court has jurisdiction over Bertera because it operates an automobile dealership in this state.  This court has jurisdiction over Napoletano and Williams because they are residents of this state.  This court has jurisdiction over Santander because it regularly conducts business in this state.

9.      Venue in this court is proper because Plaintiff, Bertera, Napoletano, and Williams are residents of this state and because the actions complained of occurred in Connecticut

10.     Prior to the spring of 2011, Plaintiff was employed by Foley Carrier Services as a DOT specialist.  Around that time, he was laid off from that position, and he was unemployed for a period of approximately eight months.

11.     On or about January 15, 2012, Plaintiff obtained a new position as a manager of Johnston & Murphy at the West Farms Mall in Farmington, Connecticut.

12.     Shortly after securing employment, Plaintiff began to look for a motor vehicle.  He required a vehicle for his personal and family use, primarily to enable him to commute between his home (which was, at that time, in Hartford) and Farmington, to enable him to see and transport his two young children, aged 7 and 9, who live with their mother in East Hartford pursuant to a joint custody arrangement, and for everyday transportation.

13.     Up until this time, Plaintiff had relied upon others to assist with transportation, primarily his girlfriend, Ariana Texidor ("Texidor"), who lives in East Hartford, Connecticut.

14.     Plaintiff had been working for some time with another car dealership to purchase a vehicle but, because of Plaintiff's lack of money for a down payment and

3

problems with his credit, the other dealership was unable to approve him for an automobile loan.

15.     On or about February 21, 2012, Plaintiff received a "voucher" in the mail from Bertera informing him that he had been "preapproved" to purchase a motor vehicle and offering a credit of up to $2,700 off the price of the vehicle's in Bertera's inventory.

16.      In reality, Plaintiff had not been "preapproved" for anything, and Bertera does not provide "discounts" off of its regular prices to holders of these vouchers. Instead, the voucher was a deceptive and fraudulent device in order to generate leads for motor vehicle sales.

17.     Approximately the following day, or on or about February 22, Plaintiff called Bertera and spoke with a salesperson named Sabrina.  Plaintiff asked Sabrina if the voucher was legitimate and if he had really been preapproved to purchase a car at a $2,700 discount, and Sabrina deceptively and falsely responded that the voucher was legitimate.

18.     Because Plaintiff had been employed for only about two months, he did not have much money for a down payment, and he asked Sabrina if he would be able to use the voucher as a downpayment or whether the voucher would be used to reduce the purchase price of the vehicle.  Sabrina falsely and deceptively responded that Plaintiff would be able to use the voucher whichever way he wanted.

19.     Sabrina urged Plaintiff to come to Bertera to meet with her, and she suggested that he first look at Bertera's website to look at some of the cars.

20.     Plaintiff and Texidor looked at multiple cars on Bertera's website.  One car that Plaintiff was particularly interested in was a 2005 Infiniti G35 (the "Infiniti"), which

4

was identified on the website by its vehicle identification number and was advertised on the website for a price of $16,598.

21.     Plaintiff and Texidor went to Bertera and met with Sabrina a day or two after the initial phone conversation.  Plaintiff looked at a number of motor vehicles on the lot and then asked Sabrina about the Infiniti, which Sabrina had someone bring for Plaintiff to see.

22.     Plaintiff and Texidor looked over the Infiniti closely and were very pleased with its appearance.

23.     Plaintiff test drove the Infiniti and, during the test drive, Sabrina told Plaintiff that the Infiniti was a very popular car and would sell quickly, and if Plaintiff wanted Bertera to hold the car, it would be necessary to put a deposit on it.

24.     Plaintiff had very little money available to him at that time, as he had just given a $400 deposit to the other dealership that had attempted, without success, to approve his credit application.  Plaintiff said that he had $100 in his checking account and that he would be able to pay an additional $400 once he got a refund of the deposit with the other dealership.

25.     Sabrina agreed to accept a $500 deposit, and they drove to an ATM machine, and Plaintiff withdrew $100, which constituted nearly his entire bank balance, and gave it to Sabrina as a deposit on the Infiniti.

26.     Upon returning to the dealership, Plaintiff was told that the price of the Infiniti was just under $18,000.

27.     At this time, Plaintiff asked about the voucher.  Despite Bertera's prior representations that Plaintiff had been preapproved and that his voucher could be used

to cover the down payment, Plaintiff was told that, due to his credit, he would have to put a large down payment on the Vehicle, but that Bertera would try to work something out.

28.     In response, Plaintiff told Sabrina that he could pay only $1,500 as a down payment, which he planned to pay from his next paycheck.

29.     Also at this time, Sabrina provided a credit application form for him to fill out.  Plaintiff and Texidor completed the application together; with Plaintiff providing the information and with Texidor, who has much neater handwriting than Plaintiff, filling out the form.

30.     One of the questions on the credit application concerned Plaintiff's length of employment, which Plaintiff and Texidor honestly answered by stating that he had been employed for two months.

31.     Plaintiff signed the credit application and delivered it to Sabrina.

32.     Sabrina told Plaintiff she would need a few days to work on the deal, and Plaintiff agreed to return to Bertera with the remainder of the deposit.

33.     On or around February 27, 2012, Plaintiff returned to Bertera with the remaining $400 for the deposit.   Sabrina accepted the money and told Plaintiff that she would get back to him within a few days.

34.     Unbeknownst to Plaintiff, Bertera submitted false credit information to Santander.  Specifically, Bertera informed the lenders that Plaintiff had been employed for more than two years. This submission of false information constituted a violation of the CROA and CUTPA.

6

35.     Additionally, multiple finance companies, including Captial One Auto Finance, Wells Fargo Dealer Services, Americredit, and Chase Auto Financing, made inquiries into Plaintiff's credit at this time, and Plaintiff believes and therefore alleges that Bertera submitted credit information to them.  Some or all of that credit information submitted to these lenders may have also been fraudulent.

36.     On or around February 29, Sabrina contacted Plaintiff by phone and told him that he was approved to purchase the Vehicle, but that Plaintiff would need to pay an additional $2,600 down.

37.     Plaintiff responded that he did not have the money at the time and that he would need a month to come up with a down payment of that size.  Plaintiff and Sabrina agreed to wait to complete the transaction and that Plaintiff should return to complete the purchase during the first week of April.

38.      A few days later, Plaintiff obtained the down payment money from Texidor's father, Louis Texidor, and he contacted Sabrina to request an earlier pickup. In response, Sabrina said they would get the car ready for delivery.

39.     Plaintiff and Texidor returned to the dealership around 10:45 a.m. on or about March 3, 2012 and met with Napoletano.

40.     When Plaintiff arrived at the dealership, Plaintiff told Napoletano that he had to be at work by 1:30 p.m.  Napoletano responded that it would take only fifteen minutes to complete the paperwork.  Despite his early arrival, Plaintiff was not presented with the purchase paperwork until approximately two hours later at about 12:45 pm, which was very shortly before he had to leave for work.

41.     Plaintiff believes, and therefore alleges, that Bertera deliberately delayed providing him with the contract documents so that he would not have time to carefully review them.  The papers were dated March 2, and Plaintiff believes that they had been prepared the previous day.

42.     The cash price for the Infiniti in the contract documents was $17,245.57.

43.      Bertera violated CUTPA by selling the Infiniti for a price that was greater than the advertised price of $16,598 and by not crediting Plaintiff for the voucher.

44.     Plaintiff did not notice the purchase price, but he did notice the monthly payments, and he questioned Napoletano regarding them, to which Napoletano responded that the payments were as low as he could get them.

45.     This was a false and deceptive statement.

46.     Plaintiff signed the contract documents presented by Bertera, including a retail installment sales contract that listed Bertera as the Creditor-Seller and Plaintiff as the Buyer.

47.     On or around March 8, 2012, nearly a week later Plaintiff executed the contract documents, Napoletano contacted him and requested that Plaintiff provide a copy of his W-2 statement of wages for 2011.

48.     Plaintiff responded that he had only started working for Johnston & Murphy a few months earlier and that he did not have a W-2 for 2011.

49.     Napoletano responded that Plaintiff's credit application said he had been employed there for 2 years and 2 months.

50.     Because the credit application that Texidor and Plaintiff had filled out truthfully stated that Plaintiff had worked at Johnston & Murphy for only two months,

another individual at Bertera had fraudulently and falsely entered incorrect information on a computer based financing program that Bertera uses for purposes of submitting credit information to third party lenders.

51.     Napoletano then told Plaintiff that he might have to bring the car back and trade it for something less expensive, and that he would call Plaintiff back.

52.     When Napoletano called Plaintiff back, he told Plaintiff that he could keep the Vehicle only if he paid an additional $2,100 as a down payment; otherwise Plaintiff would have to return the Vehicle and wait until he had been employed for three months before he could pick it up again.

53.     Plaintiff was unable to pay $2,100 at that time, so Napoletano told him that he had 24 hours to return the Vehicle.

54.     Bertera had no right to require Plaintiff to return the Vehicle, as he had entered into a valid and enforceable retail installment sales contract for the Vehicle with Bertera and was the rightful owner of the Vehicle.

55.     In reality, Bertera was unable to assign Plaintiff's retail installment contract to a third party lender because it was unable to verify the fraudulent credit information that Bertera had submitted in order to obtain preapproval for the assignment of the contract.

56.     Rather than adhere to the terms of the contract that Bertera had entered into with Plaintiff, Napoletano lied to and misrepresented the status of the account.

57.     Believing Napoletano's false statements, Plaintiff returned the Infiniti to Bertera the following day.  He was told that the Vehicle would sit on the lot with a "sold"

sign and the license plates on it until he had been working for three months would be able to be approved.

58.     Plaintiff knew that he would be paid at work and receive a paystub on April 13, which was only two days before the three-month anniversary of his employment. Not wanting to wait until another pay period was completed, he inquired whether the April 13th paystub would be sufficient to demonstrate three months of employment.

59.     Napoletano said that would suffice.  This was a fraudulent and deceptive statement, because Bertera had not obtained preapproval of the account and did not intend to extend credit

60.     On or around early April, Plaintiff spoke with Napoletano in an attempt to verify that the car would be ready to pick up on April 13.  At this time, despite his prior representation, Napoletano responded that Plaintiff had to wait until he had received a pay stub after his April 15 anniversary date before he could pick up the car.

61.     Frustrated by the inconsistent communications from Napoletano, Plaintiff contacted Sabrina and told her that he did not want to work with Napoletano anymore due to their previous negative interactions.  He faxed her a copy of his paystub and asked if he could proceed.

62.     At that point, Sabrina referred him to another Bertera employee named Doug.

63.     Plaintiff spoke with Doug on or about April 13, and Doug told him that he could come in and pick up the car.

64.     Plaintiff and Texidor returned to Bertera, and they discovered that the Infiniti had dents and scratches that were not there previously.  They also observed that the odometer was 10 more miles greater than at the time he had left the Infiniti.

65.     At this time, Doug presented Plaintiff with a new set of contract documents; the cash price for the Infiniti was now $14,908, which was lower than the previous price but still greater than the advertised price less the voucher.

66.     Doug told Plaintiff that the price had been lowered as "compensation" for the damaged condition of the Vehicle.

67.     This was a false and deceptive statement, as Plaintiff believes and accordingly alleges that the price had been lowered because Bertera had been unable to obtain credit approval for the Infiniti on the terms in the original contract and that it was forced to reduce the purchase price for Santander to pre-approve the assignment of the second retail installment contract.

68.     Additionally, Bertera had increased the annual percentage rate of interest. This rate was higher than the rate at which Santander had agreed to finance the Infiniti, and Bertera increased the interest rate in order to make additional profit.

69.     Plaintiff signed the second set of contract documents presented by Bertera, including a second retail installment sales contract that listed Bertera as the Creditor-Seller and Plaintiff as the Buyer.

70.     Despite the difference in the mileage, Bertera failed to update the purchase paperwork to reflect the higher mileage on the Vehicle.

71.     Before driving the car off the lot, Plaintiff asked Doug whether there would be any more problems with his keeping the car.  Doug responded that Plaintiff owned the car and that he was all set.

72.     After leaving Bertera, Plaintiff noticed that the Vehicle's first gear wasn't functioning properly and was making a noise.

73.     Plaintiff called the dealership on April 23, 2012 and made arrangements to bring the Vehicle in for service on April 26, 2012.

74.     Later that day, on April 23, 2012, Plaintiff was contacted by defendant Santander who requested Plaintiff provide it with the last four digits of his social security number and his employment start date.

75.     Plaintiff responded that the last four digits of his social security number were 2116, to which the Santander representative responded that Santander's records reflected the last four digits of his social security number were 2115.  Plaintiff also told the Santander representative that his employment start date was January 15, 2012.

76.     Plaintiff inquired as to whether there was a problem, to which the Santander representative responded that she just needed to verify his information.

77.     On April 24, 2012, Plaintiff was contacted by Napoletano, who told Plaintiff that he needed to bring the Vehicle back.

78.     Napoletano told Plaintiff that the reason why he had to bring the Vehicle back was due to a change in his credit.  Plaintiff responded that there had been no changes to his credit except for the fact that Bertera had submitted his credit to multiple finance companies.

79.     Napoletano told Plaintiff he had 24 hours to return the Vehicle.

12

80.     After speaking with Napoletano, Plaintiff contacted Santander.  Phyllis, the Santander representative with whom Plaintiff spoke, informed Plaintiff that Santander had just received Plaintiff's application yesterday, and that something was different on Plaintiff's credit from when he originally completed the purchase paperwork.  Phyllis did not specify what that difference was or what was wrong or different with Plaintiff's credit.

81.     After speaking with Santander, Plaintiff called Bertera and spoke with Napoletano for a second time.  Napoletano told Plaintiff that if he did not bring the car back within 24 hours, Bertera would "take other measures."

82.     At no time did Santander provide Plaintiff with written notice that his credit application had been denied.

83.     On April 24, 2012, Plaintiff received several calls from Napoletano asking when he was planning on bringing the car back.

84.     On April 25, 2012 Plaintiff took the Vehicle to a dealership in Manchester, Connecticut to have the Vehicle's first gear evaluated.   The technician who looked at the Vehicle opined that whoever had been driving the Vehicle had been accelerating quickly from a stop and "dumping the clutch."

85.     Based on this evaluation, and based on the increased mileage on the car at the time of pickup on April 13, Plaintiff believed that a Bertera representative had driven the car while it was in Bertera's possession.

86.     On or around April 25, 2012, Plaintiff contacted the Department of Motor Vehicles ("DMV") regarding Bertera's request that he return the Vehicle.  Carl, the DMV representative with whom Plaintiff spoke, told Plaintiff that the Vehicle was registered to him and that he did not have to return it.

87.     On or around April 26, 2012, Napoletano contacted Plaintiff by telephone at work and asked when Plaintiff would return the Vehicle.  Plaintiff responded that he had spoken with the DMV and was told that he did not have to return the Vehicle.

88.     Sometime later, Napoletano called Plaintiff's work a second time, and another employee answered the phone and said Plaintiff was unavailable.

89.     Napoletano told the employee to tell Plaintiff that if Plaintiff failed to return the car by 5:00 pm, Napoletano would call the Hartford police and report the car as stolen.

90.     Following this call, Plaintiff called the Hartford police department and explained the situation.  The officer with whom Plaintiff spoke told Plaintiff that Bertera had no right to take the Vehicle and offered to contact Bertera to inform them that they should refrain from contacting Plaintiff.

91.     Later that evening, around 9:30 PM, Plaintiff left his place of employment and found his Vehicle to be missing from the parking lot.

92.     Plaintiff spoke with a nearby police officer and told the officer that his Vehicle had been stolen.

93.     Eventually, Plaintiff learned that the Vehicle had been repossessed from the parking lot by Whitey's Towing at the direction of Bertera.

94.     At the time that the Vehicle was repossessed, the Vehicle contained personal property of Plaintiff's that was worth approximately $600.

95.     As a result of the actions of Bertera and Napoletano, Plaintiff suffered severe emotional distress, embarrassment and shame.

14

96.     On or around May 14, 2012, either Williams or another Bertera employee acting with Williams' knowledge, forged Plaintiff's signature on the Assignment of Ownership portion of the Vehicle's title in order to transfer ownership of the Vehicle from Plaintiff to Bertera.

97.     Williams executed the title on behalf of Bertera as the recipient of the Vehicle from Plaintiff, knowing that signature purporting to belong to Plaintiff was not genuine, and she signed the form purporting to transfer title of the Vehicle from Plaintiff to Bertera.  In so doing, Williams falsely signed Plaintiff's signature without his knowledge or consent.

98.     On or around June 5, 2012, Williams signed the title on behalf of Bertera in order to assign ownership to a subsequent consumer purchaser.

99.     Bertera submitted the title containing the forged signature to the DMV so that a new title would issue in the name of the subsequent purchaser.

100.    Bertera breached its contract with Plaintiff when it required Plaintiff to return the Vehicle after he had validly executed the First Retail Installment Contract.

101.    Bertera breached its contract with Plaintiff when it attempted to induce Plaintiff to return the Vehicle and subsequently repossessed the Vehicle after Plaintiff had validly executed the Second Retail Installment Contract.

102.    Bertera failed to provide Plaintiff with notice of disposition that complied with Conn. Gen. Stat § 42a-9-614 or Conn. Gen. Stat. § 36a-785(d), and it has not accounted to him for its proceeds in selling his Vehicle which it has improperly repossessed.

103.    Although Plaintiff completed only one credit application on or around February 22, 2012, Santander inquired into Plaintiff's consumer reports on February 26, 2012 and again on April 13, 2012.

104.    Santander violated FCRA § 1681b(f) in that it inquired into plaintiff's consumer reports without proper authorization.

105.    Bertera and Santander did not provide Plaintiff with written notice that his credit application had been rejected in violation of the ECOA.

106.    Bertera has violated TILA by not disclosing that the annual percentage rates were estimated due to the fact that, from Bertera's perspective, the contracts were contingent and not final until assignment to a third party.  Bertera also violated TILA by withholding the value of the credit extended with respect to the two contracts, by its inaccurate itemization of the amount financed in the second contract, and by failing to provide Plaintiff with copies of the disclosures in the form that he could keep before he became committed to the transaction.

107.    Bertera has violated RISFA and the UCC by its two repossessions of the Infiniti when Plaintiff was not in default on the contracts, by its failure to provide the notices required under those statutes, and by failing to account to Plaintiff for the disposition of the Infiniti.

108.    Bertera and Santander both violated FCRA by inquiring into Plaintiff's credit without a pending credit application.

109.    Bertera and, possibly, Napoletano, violated the CROA by providing false information to finance companies regarding Plaintiff's creditworthiness in order to induce them into accepting the assignment of the two retail installment contracts.

16

110.    Bertera and Napoletano committed civil theft and misappropriated Plaintiff's property by first falsely informing him that he was required to return the Infiniti after Plaintiff executed the first retail installment sales contract and then by forcibly taking possession of the Infiniti after he executed the second retail installment sales contract.

111.    Bertera and Williams committed civil forgery by forging Plaintiff's signature on the reverse side of the title or by falsely representing that the signature was genuine or both.

112.    Bertera and Napoletano have committed unfair trade practices in violation of CUTPA and have engaged in fraud and misrepresentation.

113.    By its actions as described above, Bertera willfully violated TILA, RISFA, ECOA, CROA, UCC, and it has committed fraud, forgery, fraudulent misrepresentation, negligent misrepresentation, breach of contract, infliction of emotional distress, misappropriation, and civil theft.

114.    By his actions as described above, Napoletano willfully violated CROA, CUTPA, and has committed the common law torts of fraud, negligent misrepresentation, fraudulent misrepresentation, and infliction of emotional distress.

115.    By her actions as described above, Williams violated CUTPA and committed fraud and forgery.

116.    To the extent that Santander had accepted assignment of either of the retail installment sales contracts and then reassigned them to Bertera, it is liable to Plaintiff for Bertera's violations.

**Wherefore, Plaintiff claims** Actual damages and common law punitive damages for the fraud, breach of contract claims; double damages pursuant to C.G.S. 52-565; treble damages pursuant to C.G.S. 52-564; actual damages pursuant to the misrepresentation claims; emotional distress damages;  actual money damages pursuant to 15 U.S.C. §1691e(a), punitive damages of $10,000 pursuant to 15 U.S.C. §1691e(b), and attorney's fees and costs of this action pursuant to 15 U.S.C. §1691e(d);  actual damages pursuant to 15 U.S.C. § 1640(a)(1), statutory damages of $2,000, plus a reasonable attorney's fee pursuant to 15 U.S.C. § 1640(a)(3) for each of the two TILA violations,; statutory punitive damages pursuant to C.G.S. § 42-110g(a); attorney's fees pursuant to C.G.S. § 42-110g(d); actual and punitive damages plus a reasonable attorney's fee pursuant to 15 U.S.C. § 1679g; statutory damages pursuant to C.G.S. §42a-9-625; actual damages pursuant to C.G.S. § 42a-2-713; incidental and consequential damages pursuant to C.G.S. § 42a-2-715; statutory damages pursuant to C.G.S. § 35a-785(d);  an order from the Court Bertera to cease and desist from engaging in unfair and deceptive trade practices; plaintiff also claims a reasonable attorney's fee, plaintiff seeks recovery of monetary damages; statutory damages pursuant to 15 U.S.C. § 1681n; punitive damages pursuant to 15 U.S.C. § 1681n; costs and attorney's fees pursuant to 15 U.S.C. § 1681n; damages, costs and attorney's fees pursuant to 15 U.S.C. § 1681*o*; and such other further relief to which Plaintiff is, at law, or in equity and by statute, entitled to against Bertera and Santander.

**PLAINTIFF, SAEED JACKSON**

By: /s/Daniel S. Blinn_____
   Daniel S. Blinn, ct02188
   Consumer Law Group, LLC
   35 Cold Spring Rd. Suite 512
   Rocky Hill, CT  06067
   Tel. (860) 571-0408
   Fax. (860) 571-7457
    dblinn@consumerlawgroup.com